In the matter of NICHOLAS LUCIEN METZGER.

A treaty containing provisions to be executed *in futuro,* is in the nature of a contract, and does not become a rule for the courts until legislative action shall be had on the subject.

The treaty with France of 1843, providing for the surrender of fugitives from justice, cannot be executed by the President of the United States without an act of congress.

No person can be surrendered under that treaty who is merely charged with crime before a committing magistrate. He must, under our law, be indicted, or under the French law be *mis en accusation* by the *chambre des mises en accusation.*

HABEAS corpus. Convention with France of 9th Novem-1843, relative to fugitives from justice.

The prisoner was a notary public in one of the departments of France, which he left and came to this country. After he had left his residence, it was charged against him that he was a defaulter to his clients to a large amount, for moneys of theirs which he had embezzled, which embezzlement he had attempted to conceal by means of forgeries.

Complaint to that effect was made against him, before a French committing magistrate, who issued a warrant for his arrest. He was not, however, apprehended on the warrant,

In the matter of Nicholas Lucien Metzger.

but the papers, duly authenticated, were transmitted to this country, and the French minister to this country demanded his surrender under the treaty with France of 1843. That functionary was referred by the secretary of State to the courts or magistrates of the country, and accordingly made application to one of the police magistrates of New York for a warrant, on which Metzger was arrested. An examination was had before that officer, who adjudicated that the prisoner was within the treaty, and issued his warrant committing him to prison until the President of the United States should demand him.

Before that demand was made, the prisoner was taken before the circuit judge of the first circuit on habeas corpus. That officer decided that the police magistrate had no jurisdiction in the matter, and the prisoner was entitled to be discharged from that commitment.

The French diplomatic agent then made application to the United States district judge, before whom similar proceedings were had, which resulted in a similar adjudication, and a like warrant of commitment.

Application was then made to the Supreme Court of the United States for a writ of habeas corpus to review the action of the district judge. The application was denied on the ground that that court had no power to review the action of a district judge at chambers.

Thereupon the President of the United States issued his mandate to the marshal of New York, commanding him to surrender the prisoner to the diplomatic agents of the French government. Before, however, the surrender was actually made, a writ of habeas corpus issued, directed to the marshal, returnable before EDMONDS, Circuit Judge.

The matter was twice argued before him, and under the judiciary act of 1847 was transferred from him as circuit judge, to him as judge of the Supreme Court under the new Constitution.

The following is a copy of the petition upon which the writ of habeas corpus was granted:

In the matter of Nicholas Lucien Metzger.

To John W. Edmonds, Circuit Judge of the first circuit of of the Supreme Court of Judicature of the people of the State of New York.

The petition of P. Barthelemy shows, that Nicholas Lucien Metzger is detained, and imprisoned, and restrained in his liberty by the marshal of the District Court of the United States for the Southern district of the State of New York, at the jail of the city and county of New York, and that he is not committed or detained by virtue of any process issued by any court of the United States, or by any judge thereof, in any case where any such court or judge has or had exclusive jurisdiction under the laws of the United States, or in any case where any such court or judge has or had acquired exclusive jurisdiction by the commencement of any suit in any court of the United States; nor is he committed or detained by virtue of the final judgment or decree of any competent tribunal of civil or criminal jurisdiction, or by virtue of any execution issued upon such judgment or decree; that the cause or pretense of such detention and imprisonment, according to the best of the knowledge and belief of your petitioner, is a warrant of commitment, a copy whereof is hereto annexed, marked A, issued by his honor, Samuel Betts, District Judge of the District Court of the United States, for the Southern District of the State of New York, under pretext of the provisions of the treaty between the United States and France, called the treaty of extradition, and dated the ninth day of November, A. D., 1843, against the said Metzger as a person charged with some one or more of the offenses named in the provisions of said treaty, having escaped from the jurisdiction of the government of France, which imprisonment, your petitioner submits, is illegal for want of jurisdiction in said district judge over the person of said Metzger, or the subject-matter aforesaid, wherefore your petitioner prays that a writ of habeas corpus issue, directed to said marshal, commanding him to bring the body of the said Nicholas Lucien Metzger, together with the time and cause of such imprisonment and detention, by whatsoever name the said Metzger

shall be called or charged before, to do and receive what then and there be considered concerning said Metzger.

Dated the second day of March, 1847.

*O. Hoffman* and *N. B. Blunt*, for Metzger.

*Butler*, *United States District Attorney*, for the United States.

*Cutting* and *Tillou*, for the French government.

*The Circuit Judge:* This case involves the question whether the President of the United States has authority, by virtue of mere treaty stipulation, and without an express enactment of the national legislature, to deliver up to a foreign power, and virtually to banish from the country, an inhabitant of one of the sovereign States of our confederacy.

The importance of the question has weighed heavily upon me during the whole time that the case has been before me.

The right is claimed, and has been exercised, by that high functionary in this instance; its exercise is demanded by the French government in the name of the treaty between the two nations and a branch of the federal judiciary has sanctioned it.

Amid this imposing array against him, the prisoner, a resident among us and entitled to the benefit of our laws, has thrown himself for protection upon State sovereignty and demanded the interposition of its authority between him and the exercise of this extraordinary power. To that protection he has a right, in common with every inhabitant of our State, and it becomes my duty, as one of the State judiciary, to see that he sustains no injury in its exercise.

The apprehension that out of the discharge of this duty there might spring a conflict between national and State authority, has not been without its influence on my mind, causing me to pause long and weigh well any decision which I might make. Presenting to my mind, as this case does, the

·picture of the whole authority of the nation claiming and enforcing the surrender of the individual on the one hand, and personal liberty demanding protection against the exertion of extraordinary power on the other, I have not been free from anxiety as to the conclusion at which I might arrive and the consequences which might flow from it.

. The question is, in a great measure, under our institutions, anomalous, arising out of that peculiar provision of our national Constitution which declares that all treaties made under the authority of the United States shall be the supreme law of the land. But for this provision, and the construction claimed for it, the question might justly be regarded as already settled by authority. ·The British government, in February, 1843, made a treaty with France, identical in this regard with the convention between France and the United States. The British administration and the British parliament did not deem that the convention executed itself, or that it could be executed without legislative enactment. Hence the statute 6 and 7 Vict., ch. 75, was passed, which recited this clause of the convention and declared that it was expedient that provision should be made for carrying it into effect, and then enacted that any justice of the peace, or other person, having power to commit for trial persons accused of crime, etc., might examine witnesses and issue his warrant to apprehend the alleged fugitive and commit him to jail until delivered pursuant to the requisition.

Under this statute the Lord Mayor of London, in September, 1844, issued his warrant for the arrest of an alleged fugitive from France, who, on being arrested, was brought before the Queen's Bench on habeas corpus. That court held the warrant void, and, on being applied to for the purpose of remanding the prisoner, as a person accused under the treaty, they denied that they had any power but under the statute, and if its provisions were not clearly complied with, they had no power at all in the matter. (*In re Besset*, 1 New Sessions Cases, 337.)

Here, then, is a decision that, on the principles of common

In the matter of Nicholas Lucien Metzger.

law, the treaty does not execute itself, and that even the highest judiciary in the nation could not act under it but in pursuance of a statute, and this exposition flows, not only from the British courts, but from the British executive and the British legislature.

I know of nothing except the provisions of the Constitution of the United States to which I have alluded, which can exempt our courts from the binding force of the same doctrine, when they and the English courts alike draw the principles of their action, and the rule and guide of their judgments from the same fountain of the common law.

Hence arises the necessity, in this case, of considering the meaning and force of this constitutional provision, and of inquiring how far it does *ex proprio vigore*, and without legislative sanction, confer upon the officers of the national government the power of executing the various matters to which it relates.

In the first place it must be observed that the provision in question does not relate to treaties alone. It is the Constitution itself and the laws of the United States, which shall be made in pursuance thereof, and all treaties made, or which shall be made, under the authority of the United States, which shall be the supreme law of the land. (Constitution, article 6.)

If this provision has this self-acting power in regard to treaties, it has it equally in regard to the Constitution at large, and from this consideration we may well appreciate the magnitude and interest of the question involved.

What is the meaning of the supremacy here provided for? That the power is itself omnipotent — self-acting and self-dependent alone — and that the functionary clothed with it, if perchance he be the executive, is in that regard beyond the control alike of the judicial and legislative departments of the government? Such must be the result, if that provision does give, as is claimed in the argument before me, to the Constitution and to treaties this self-sufficing authority.

But such, as I understand it, is not the true reading of this

provision. The twenty-second number of the Federalist defines its purpose in language more felicitous than any which I can use:

"The treaties of the United States, to have any force at all, must be considered as part of the law of the land. Their true import, as far as respects individuals, must, like all other laws, be ascertained by judicial determinations. To produce uniformity in these determinations, they ought to be submitted, in the last resort, to one supreme tribunal. * * * If there is in each State a court of final jurisdiction, there may be as many different final determinations, on the same point, as there are courts. * * * To avoid the confusion which would unavoidably result from the contradictory decisions of a number of independent judicatories, all nations have found it necessary to establish one tribunal paramount to the rest, possessing a general superintendence, and authorized to settle and declare, in the last resort, a uniform rule of civil justice. * * * The treaties of the United States, under the present Constitution, are liable to the infractions of thirteen different legislatures, and as many different courts of final jurisdiction."

Hence arose the establishment of a supreme judicatory, not that it should be omnipotent and self-sufficing in its power, but that, within its sphere, it should be paramount to all other judicatories. Hence, too, the provision in question, that the Constitution, the laws made in pursuance of it, and the treaties, should be the supreme law; not that they should be omnipotent and self-sufficing in their authority, but that they should be paramount over all other authority, so that, if when duly executed, they should come in conflict with any other, they should be supreme and paramount.

This is no novel doctrine; but, as I read the history of our country, it has prevailed from the beginning, though not now for the first time questioned.

In the celebrated case of *Jonathan Robbins*, Chief Justice MARSHALL, then a member of the house of representatives, asserted the same claim which is put forth for the government

in this case. But he went farther and followed the doctrine out to its legitimate results, by insisting that the case was one for executive and not judicial decision, and that the judicial power cannot extend to political compacts, such as the case of the delivery of a murderer under the 27th article of Jay's Treaty with Great Britain. (5 Wheat. App. 16.)

In several instances, however, and at different periods, congress has, by its action, given a different construction to this provision of the Constitution.

A few instances will suffice.

The Constitution, article 3, section 2, declares that the judicial power shall extend, among other things, to all cases affecting ambassadors, other public ministers and consuls, and that in those cases the Supreme Court shall have original jurisdiction. It might well be supposed, that if any power in that instrument, which is to be the supreme law of the land, could be thus self-acting, it would be the power thus explicitly conferred. Yet in the judiciary act of 1789, section 13, congress provides for the exercise of this jurisdiction, both for and against ambassadors and other public ministers.

So, too, the Constitution, article 4, section 2, provides that fugitives from justice shall, on demand of the executive of the State from which they have fled, be delivered up to be removed to the State having jurisdiction of the crime.

This provision also of the supreme law of the land might be supposed to execute itself, yet congress, in 1793, passed a law upon the subject, in order to carry it into effect.

The origin of this law is a striking illustration of the interpretation which prevailed at those early days.

It grew out of a demand made by the governor of Pennsylvania upon the governor of Virginia, for the surrender of a fugitive from justice. With that demand the executive of Virginia refused to comply, for one reason, among others, because congress had not passed any statute to execute this provision of the supreme law of the land. The opinion of the attorney-general of Virginia, assuming that position, and the

reply of the executive of that State, sanctioning it, were communicated to congress by President Washington, in October, 1791, and out of that state of things flowed the statute which has for more than half a century governed the whole action of our citizens in that regard. (20 American State Papers, 38.)

If the claim now asserted is well founded now, it was so then, and, if well founded, then indeed were this statute, and that, also, which came into existence at the same time, in regard to fugitives from service, works of idle supererogation on the part of congress.

So, too, the same article of the Constitution provides that persons held to service or labor in one State, escaping into another, shall be delivered up on claim of the party to whom such service or labor may be due.

This provision, too, of the supreme law, so far from executing itself by virtue of its supremacy, is helped out and carried into effect by the same law of congress, and sprung from the same necessity for legislative action which was then conceded.

So, too, the article of the Constitution (art. 2, § 3), which declares it to be the duty of the President to take care that the laws be faithfully executed, is helped out and carried into effect by the act of 1795, which gives him authority to call out the militia to suppress insurrection in any of the States.

These are all provisions of the Constitution, the supreme law of the land, which congress has at an early day deemed it necessary to legislate upon, for the purpose of carrying into effect.

And it may well be asked, why this necessity, if this supreme law was, by virtue of its supremacy, self-sufficing, and did execute itself without legislative interposition?

Such also has been the action of congress and the interpretation of the national government in relation to our treaties, which are also the supreme law.

In 1788, a convention was entered into between France and the United States, providing for the arrest and surrender of deserting seamen, in which it is provided that for that purpose the consuls shall address themselves to the courts, judges and

In the matter of Nicholas Lucien Metzger.

officers competent, and demand said deserters in writing, etc. And all aid and assistance to the said consuls shall be given for the search, arrest, and seizure, of said deserters, who shall be kept and detained in the prisons of the country, etc. In 1824 a similar treaty was made with the republic of Columbia, and from that time down to 1845, various treaties with nations in Europe, Asia and America, have been made, containing the same provision as to deserting seamen.

Specific as is this provision in these various treaties — pointing out, as it does, even the manner in which the power shall be exercised, congress and our government have been so far from regarding it as capable of executing itself, that in 1829 a law was passed in language scarcely more particular than the various treaties providing for carrying them into effect. This act is understood to owe its origin to the fact that so distinguished a jurist as Judge STORY refused to execute one of the treaties until congress had legislated upon the subject. A marked instance of a similar character is of more recent occurrence. We have a treaty with Spain providing against privateering, and declaring that if any person of either nation shall take a commission as privateer, or letters of marque, he shall be punished as a pirate; yet congress and our government did not regard this treaty — though the supreme law of the land, and distinctly defining the offense as piracy, and thus bringing it clearly within the jurisdiction of the federal courts — as sufficient to execute itself, but on the 3d of March, 1847, passed a law in the following words:

An Act to provide for the punishment of piracy in certain cases.

Be it enacted by the senate and house of representatives of the United States of America in congress assembled, That any subject or citizen of any foreign State, who shall be found and taken on the sea, making war upon the United States, or cruising against the vessels and property thereof, or of the citizens of the same, contrary to the provisions of any treaty existing between the United States and the State of which

such person is a citizen or subject, when by such treaty such acts of such persons are declared to be piracy, may be arraigned, tried, convicted, and punished, before any Circuit Court of the United States, for the district into which such person may be brought, or shall be found, in the same manner as other persons charged with piracy may be arraigned, tried, convicted, and punished, in said court.

Approved March 3, 1847.

So far as the Supreme Court of the United States have acted on this question, they seem to have adopted the same principle. In *Foster* v. *Nelson* (2 Peters, 314), they declare that a treaty is, in its nature, a contract between two nations, not a legislative act. It does not generally affect, of itself, the object to be accomplished, especially so far as its operation is infraterritorial, but is carried into execution by the sovereign power of the respective parties to the instrument. In the United States a different principle is established. Our Constitution declares a treaty to be the law of the land. It is consequently to be regarded in courts of justice as equivalent to an act of the legislature, whenever it operates, of itself, without the aid of any legislative provisions.

But when the terms of the stipulation import a contract, when either of the parties engages to perform a particular act, the treaty addresses itself to the political, not to the judicial department, and the legislature must execute the contract before it can become a rule of court. And speaking of the particular treaty then under consideration, they add: "This seems to be the language of contract, and, if it is, the ratification and confirmation which are promised must be the act of the legislature. Until such act shall be passed, the court is not at liberty to disregard the existing laws on the subject."

In the *United States* v. *Arredondo* (6 Peters, 734), that court affirmed the same doctrine, and again speak of a treaty which is a contract between two nations, the stipulations of which must be executed by an act of congress before it can become a rule for their decision.

In the matter of Nicholas Lucien Metzger.

These two cases involved the treaty with Spain of 1819, and they grew out of the words used in it, that certain grants "shall be ratified and confirmed." The court held that if these words imported that those titles "are hereby ratified and confirmed," then the treaty, by virtue of its being the supreme law, operated *per se* to ratify and confirm, but if they imported a contract, that they should at some future period be ratified and confirmed, then the treaty did not execute itself, but it must be executed by an act of congress before it could become a rule for the decision of the courts. In other words, where the treaty is a contract to be performed *in futuro*, the English rule, as laid down by Lord DENMAN, in 1 New Sess. Cases, is applicable, the courts have not any power but under the statute, and if its provisions are not clearly complied with, they have no power at all in the matter.

The Supreme Court of the United States, a third time, in reference to those words, reiterate the doctrine. In the *United States* v. *Pescheman* (7 Peters, 87), Ch. J. MARSHALL says, that although the words "shall be ratified and confirmed" are properly words of contract *stipulating for some future legislative act*, they are not necessarily so. They may import that they shall be ratified and confirmed by force of the instrument itself.

In the latter signification of the terms, in a country where the treaty is the supreme law of the land, it may perchance be well said that the treaty executes itself. But this provision in the convention with France, under which this prisoner is held, can in no such sense be held to execute itself. It never was intended to act *in presenti*. It was a contract between the two nations, to be executed only *in futuro*, and in the language of principle, of the action of congress, and the decisions of the federal judiciary, it stipulated for future legislation, without which, as the Queen's Bench declares, the courts have no power at all in the matter.

In the debate in congress on the Jonathan Robbins matter, it was stated that President Washington had entertained doubts whether the extradition clause in Jay's treaty could be

executed without legislative action. And in 20 Serg. & Rawle, 135, the Supreme Court of Pennsylvania express the same doubt, and declare that the opinion of the executive hitherto had been that it had no power to act.

In the case of *Prigg* v. *Commonwealth of Pennsylvania* (16 Peters, 624), the provision of the Constitution as to the surrender of fugitives from service was under consideration. STORY, J., in delivering the opinion of the court, speaking of that clause which enacts that the fugitive shall be delivered up on claim of the party to whom such service may be due, says: "We think it exceedingly difficult, if not impracticable, to read this language and not feel that it contemplated some farther remedial redress than that which might be administered at the hands of the owner himself.   *   *   * They require the aid of legislation to protect the right, to enforce the delivery, and to secure the subsequent possession of the slave."

And the court in that case, in adjudicating upon language very similar to that contained in this treaty, declare that the Constitution does execute itself so far as to establish the absolute right of the owner to recapture his slave, but that to enforce the right the aid of legislation is required. And by parity of reasoning, while we may regard this treaty as executing itself so far as to establish the right of the French government to the surrender, legislation is required to enforce the delivery and secure the subsequent possession of the fugitive.

The want of this legislative sanction, on which so much stress is laid, is not mere matter of form. It is a substantial right, and involves too deeply the liberty of the citizen to be dispensed with.

Treaties by our government are made by the executive without the sanction of the legislature. The extradition provided for by this convention with France is not confined to the subjects of France. An American citizen may be demanded by the French government, and our executive may, on such demand, banish a native of our soil—nay, if one,

In the matter of Nicholas Lucien Metzger.

then hundreds. And it becomes us well to see that power so great should be properly guarded.

There is another consideration flowing from this view of the case. Neither the Constitution, the laws, nor the treaty, which together constitute the supreme law as to this case, provide for the interposition of the judiciary in the exercise of this power. On the other hand the treaty provides that on the part of the United States the surrender shall be made only by the authority of the executive thereof. And although the executive has, in this case, with great propriety, invoked the aid of the judiciary, yet he has done it in such a manner that the decision of the subordinate tribunal appealed to cannot be reviewed in the court of dernier resort, and therefore becomes final.

And if the right claimed in this case, for the executive to act in the matter without legislative sanction, be once firmly established, I cannot discover any provision in the supreme law which renders it necessary for him to seek the aid of the judiciary. It may be convenient for the executive to resort to the machinery of the judiciary, or the incumbent for the time being may entertain such a sense of duty as to induce such a resort; but the right once established as now claimed, it must necessarily become a matter of discretion with the executive, whether he will require the assent of either the legislative or judicial departments to his surrendering to a foreign government any person native to the soil, or immigrant, whom it may please to demand as a fugitive from justice.

In the absence of any statutory provision, the executive can resort for the rule of its action only to the treaty. The treaty with France nowhere provides for a resort to the judiciary. Persons accused of crime shall be delivered up, provided that this shall be done only when the fact of the commission of the crime shall be so established as that the laws of the country would justify their apprehension and commitment for trial. How established, and before what tribunal? It is the executive alone who can surrender, and if the treaty alone is to be the guide of his action, then when he becomes satisfied!

that the commission of the alleged crime is established, whether that be with or without the aid of the judiciary, he can surrender.

· Such is the claim presented before me, and, if established, then is the liberty of the citizen, at least as respects extradition, subjected to executive discretion to an extent that is calculated to alarm even a country where freedom in the aggregate is so common that its invasion in detail is too often and too easily disregarded.

To meet an objection so formidable in its character, it is urged that the aid of the judiciary must of necessity be invoked in the execution of the treaty.

I have already had occasion to decide in this case, that the State magistrates have no original authority in the matter. Not having seen any reason for changing my opinion, and that opinion having been acquiesced in by all parties concerned in this matter, it must be regarded as *pro tanto* the law of this case. The remaining question, then, is, whether any of the federal magistrates have the authority? The question may well be put still broader, and comprehend not merely the inquiry whether the federal judiciary may entertain jurisdiction, but also whether it ought not to be the duty of the government, and the right of the prisoner, to make the appeal to them. I will not stop, however, here to consider that question, but pass at once to the simple topic of the authority of the federal magistrates, voluntarily or otherwise, to act in the matter. And this topic need not be discussed any farther than to the extent and as to the manner in which the authority has been exercised in this case.

It must then be observed, in the outset, that the action on which the prisoner was committed was not the action of any court, but of a district judge as such. The arrest, examination, and commitment were none of them the act of the District Court, but of the judge as such at Chambers, or as commiting magistrate. It is important to keep this fact in mind, as it is one of the main grounds on which the United States Supreme Court refused to this prisoner his application for

the writ of habeas corpus, and it brings us to the real question in this case, whether a district judge, not sitting in court, has the power to aid in carrying a treaty into effect.

Marshall, in his speech in the *Robbins case*, repeatedly denied the authority of the judiciary in every form. That was the second proposition he maintained (5 Wheat. App. 16), which was that the case was a case of executive and not judicial decision. He proceeded to refute the position of Mr. Livingston, that the judicial power of the United States expressly included that under consideration. He maintained (p. 17) that the judicial power cannot extend to political compacts, as the establishment of a boundary line, etc., or the case of the delivery of a murderer, under the twenty-seventh article of our present treaty with Britain, and he proceeded with this language: "The gentleman from New York has asked, triumphantly asked, what power exists in our courts to deliver up an individual to a foreign government? Permit me," said Marshall, "but not triumphantly, to retort the question. By what authority can any court render such a judgment? What power does a court possess to seize any individual and determine that he shall be adjudged by a foreign tribunal? Surely our courts possess no such power. Yet they must possess it, if this article of the treaty is to be executed by the courts." And he concluded with the remark: "The case was in its nature a national demand made upon the nation. The parties were the two nations. They cannot come into court to litigate their claims, nor can a court decide on them. Of consequence, the demand is not a case for judicial cognizance."

Again (on page 28), he says: "It is then demonstrated that, according to the practice, and according to the principles of the American government, the question whether the nation has or has not bound itself to deliver up an individual charged with having committed murder or forgery within the jurisdiction of Britain, is a question, the power to decide which rests alone with the executive department.

The inference from that debate and its results, is as fair, per-

haps, as any other, that the majority of congress who went with him on that occasion, and, in the language of Judge STORY, "put the question at rest forever," intended to sustain that as well as the other principles which he then advanced.

Mr. Marshall maintained that a treaty providing for the surrender of fugitives being made, the executive was competent, of itself, without judicial or legislative aid, to execute it. How far he is competent without legislative aid, has already been shown from authority, upon principle, and by the action of the government for fifty years. And the United States Supreme Court, in the case of *Holmes* v. *Jennison* (14 Peters), and, more recently, on the application of Metzger for a habeas corpus, have recognized the necessity of judicial action.

But then the questions recur, whence do the judiciary derive their authority to act in the matter? Who is to set them in motion, and what is to regulate and control the form and manner of their going? And how are the rights of the accused to be protected?

These are important questions under our State Constitution, which declares that no man shall be deprived of any of the rights or privileges secured to him, unless by the law of the land, or the judgment of his peers.

The learned judge, upon whose warrant the prisoner was committed, evidently has strong doubts upon this subject, though he thinks them capable of a satisfactory solution. But the solution which he discovers is applicable only to courts of the United States, not to the judges acting out of court, and he seems to have overlooked the distinction which the Supreme Court have since rendered so important, as on that ground to deny to the prisoner the privilege of having his case reviewed in the federal courts. Under that decision I am not at liberty to disregard so grave a distinction, and am compelled to inquire, if, perchance, the courts have the power, does it follow that the judges out of court possess it also? If so, whence does it flow? Not from the Constitution, for that is silent on the subject; not from the treaty, for that is equally silent; not from any express statutory enactment, for the want of that

In the matter of Nicholas Lucien Metzger.

has been throughout the whole case the great ground of complaint; and not from necessary implication from any power otherwise granted.

It seems to me, then, that it can trace its origin to no other source than the necessity or convenience of the case.  When we are brought to this point, then, the whole course of reasoning on which was founded my decision, that the police magistrate acted without authority, becomes equally applicable to the district judge.  In the absence of any provision of the Constitution, of the treaty, or of the statute, conferring the power upon that officer, I am compelled, by the view which I then took of the case, and which was acquiesced in on all hands, to arrive at the same conclusion as to his power.

It is with unfeigned diffidence, and after long consideration, that I have imbibed a view of this case so different from that entertained by the learned judge whose decision I am compelled, from my position, thus to review.  His long experience, and the high respect which I entertain for his judicial character, might have inclined me to yield my own conviction to his, if his own opinion of the power of the United States Court had been clear and decided, or if he had at all considered the power of a judge out of court; a distinction, I repeat, which has been rendered important by the subsequent decision of the Supreme Court of the United States.

There is another view of the case which has had its weight with me, and that is the mode of reviewing the decision of one of the federal judiciary, which is thus brought about. Such review is not ordinarily through the State tribunals, yet I see no way in which it can be avoided in this case.  I was bound by the law of the sovereignty whose minister I am, under severe penalties, to allow the writ of habeas corpus.  It was to the prisoner, under our laws, a writ of right.  The United States Supreme Court having denied to him the privilege of carrying up the decision of the district judge directly for their review, he had a right to resort to the State tribunals as the conduit through which he can more indirectly pass to that ultimate tribunal, whose peculiar province it is to pass

upon all questions arising under treaties made by the authority of the United States.

The writ being returned before me, it was my duty to inquire into the cause of his detention, and that not merely as it appeared on the warrant by which he was held, but as it might appear from any fact alleged before me to show that his imprisonment or detention was unlawful, or that he was entitled to his discharge. (2 Rev. Stat. 569, § 50.) I have, therefore, of necessity, gone behind the mandate of the President and inquired into the legality of the foundation on which it rested. And finding it to be wanting in the legal aliment necessary to support it, I have no alternative but to declare that the prisoner cannot lawfully be held under it.

It will be observed that I have in this opinion omitted to discuss many of the points raised before me on the several arguments which have been had in the case. This omission has not arisen from the want on my part of attention to, and careful consideration of, them, but solely from the belief that their consideration was not necessary to the determination of the case, on which I was to render my judgment.

There is, however, one topic on which I differ in opinion with the learned district judge, which strikes me with so much force that I cannot forbear dwelling a moment upon it.

The Spanish treaty, which has been already alluded to, contained a stipulation as to the ratification and confirmation of certain grants of land therein mentioned. The English side of the treaty contained, in that regard, the words "shall be ratified and confirmed." The United States Supreme Court, in construing those words, in *Foster* v. *Neilson* (2 Pet. 253), held that they imported a contract to be performed at some future time, and therefore, as has been already mentioned, required legislation before that part of the treaty could become a rule for the courts.

That treaty again came before the court in *United States* v. *Percheman* (7 Pet. 87), when it was said that the treaty was drawn up in the Spanish as well as the English language. Both were originals, and were unquestionably intended by

In the matter of Nicholas Lucien Metzger.

the parties to be identical. The Spanish had been translated, and they then understood that the article (of the treaty), as expressed in that language, was that the grants "shall remain ratified and confirmed," etc. The court then holds that if the English and Spanish parts can, without violence, be made to agree, that construction which establishes this conformity ought to prevail. No violence is done to the language of the treaty by a construction which conforms the English and Spanish to each other. Although the words "shall be ratified and confirmed" are properly words of contract, stipulating for some future legislative act, they are not necessarily so. They may import that they shall be ratified and confirmed by force of the instrument itself. When we observe that in the counterpart of the same treaty, executed at the same time, by the same parties, they are used in this sense, we think the construction proper if not unavoidable.

To apply that principle to the case in hand.

The convention with France, under consideration, is drawn up in the French as well as the English language. In the latter language, when the party to be surrendered is spoken of, he is twice spoken of as the person "charged," and twice as the person "accused." In the French counterpart, the expression is uniformly *accusé:* "*les individus accusés*" — "*les individus qui accusés*" — "*les individus qui seront accusés*" — *L'individu ainsi accusé.*"

It appears from the opinion of the learned district judge, that it was claimed before him that this French phrase was equivalent to the term in our law "indicted or arraigned, and that it was proved before him that such is the understanding of the term by the bar and the courts in France. *Inculpe* and *prevenue* designate persons against whom criminal charges or proceedings are instituted, up to the period when the charges are acted upon by the *Chambre des mises en accusation*, and an accusation is decreed by it, and then, and not before, they become *accusees*. (Code d'inst. Crim. arts. 127, 128, 241, 265.)

The same question, then, arises here that arose under the

56—vol. 1.

Spanish treaty — which language is to prevail in the construction? If the English, then a party merely "charged" or "accused" before the committing magistrate, may be demanded. The prisoner is in that precise situation. He has been charged or accused before a magistrate authorized to arrest, and nothing more. But if the French phrase is to prevail, then the prisoner does not come within the treaty, because he has never been indicted or arraigned, never been *mis en accusation*.

There is a great difference in the French practice, as well as in ours, between a person merely charged with a crime and one who has been indicted; between *inculpe* and *accusee*. There is much more solemnity in the latter than in the former, more probability of guilt; a farther progress toward conviction has been attained, and the questions, both as to the guilt of the prisoner, and the nature of the offense, no longer rest merely upon the untried and uninvestigated complaint of a party, but have been investigated by the proper tribunal, the grand jury or the *Chambre des mises en accusation*, and probable cause for the accusation been duly found, and the nature of the offense charged duly defined.

This is an important consideration, for it is not every offense with which a person may be charged, for which he can be surrendered. It is only a few specified cases, and it often becomes an extremely difficult question for courts, even after the fact is established, to ascertain the nature of the offense growing out of it.

In this case it is very difficult, if not quite impracticable, for an American lawyer to determine whether the act charged upon the prisoner was forgery under the French law. If the matter had passed through the *Chambre des mises en accusation*, and the prisoner had been *mis en accusation*, had become *accusee*, it would have been judicially determined that if the prisoner had done the acts imputed to him, it would constitute the crime of forgery, but now the complexion of the act, whether forgery or not, rests in a great measure, if not solely, on the charge of the complainant. So, too, under our law, it

is often difficult to define the boundary between breach of trust and constructive larceny, between mere fraud and the felony of obtaining money under false pretences. And when we come to the exercise of so important a duty as the surrender of a native or naturalized citizen to the demand of a foreign nation, to be tried in a foreign judicatory, shall it depend on the complexion which the anger or malice of the complainant may give to the case, or shall it obtain its hue from the investigation which the grand jury or the *Chambre de Conseil* may subject it to?

These inquiries are too important to have escaped the attention of the contracting parties, and hence we find a phrase, having a definite meaning in· the French Code, entirely inconsistent with the idea of allowing so important a consideration as extradition to rest upon the color which the complainant may give the matter, purposely, repeatedly and carefully used, in a manner which, under our law, gives it controlling influence over both parties to the treaty. So that a person demanded of the French government by ours, would not be surrendered unless he had been indicted or *mis en accusation*. At all events the French government might so act with great propriety, and point to the language it had carefully used in the convention as a perfect answer to the demand.

Entire reciprocity was evidently aimed at by both parties, and I cannot conceive a reason why the language of the Supreme Court, in regard to the Spanish treaty, does not apply here with equal force, and why I am not bound to hold, as the Supreme Court then held, that if the English and French parts can without a violence be made to agree, that construction which establishes this conformity ought to prevail, and that no violence will be done to the language of the treaty by a construction which conforms the English and French to each other.

If this construction is to prevail, then it is inevitable that the prisoner is not within the treaty, and cannot be demanded by the French government, nor surrendered by the American,

but is entitled to the protection of the laws of this State against the attempt to surrender him.

The conclusion, then, at which I have arrived, is that the prisoner is not a party accused—*mis en accusation*—within the meaning of the treaty, and that the President cannot execute the power of extradition without both legislative and judicial sanction, and I acknowledge that the conclusion commends itself to my favor, because of the protection it is calculated to afford to personal liberty against the executive authority.

The prisoner must therefore be disc' arged.

[NOTE.—At the next succeeding session of c 'ngress the attention of the senate was called to this case, and it was referr 'd to the judiciary committee of that body. That committee afterward repc ted a bill recognizing the principles of this decision, and providing a reme ly for the defect pointed out in it. The bill became a law on the 12th of A 'gust, 1848.]

The question of extradition was afterward, and in 1853, again before the same judge, and his ruling then produced the following opinion of the attorney-general of the United States, on which, it is understood, is established the practice now pursued by the government in all cases of the surrender of fugitives from justice under treaty stipulations:

ATTORNEY-GENERAL'S OFFICE, Aug. 31, 1853.

SIR : I have considered the question presented by your note of yesterday.

It appears that, on application in behalf of the British government, duly made to that of the United States, a mandate issued on the 12th instant, in the name of the President, calling on certain magistrates therein designated, or any one of them, to cause William Calder, charged with the crime of forgery committed in Great Britain, to be arrested as a fugitive from justice, and to examine the evidence of his criminality, and, if the charge should be sustained, to certify the same to the President, to the end that said Calder may, in such case,

be surrendered to the proper authorities of the British government.

This mandate, the issue of which is a departure from the recently preëxisting practice of the government, seemed to be called for by the action of the Supreme Court of the United States in Kaine's case (*In re Kaine*, 14 Howard, 103); for although the necessity of such a mandate is not the thing specifically passed upon by the court in that case, yet the views expressed by some of the members of the court as to the true course of proceeding in such cases, and the analogy of the practice in Great Britain itself, led to the conclusion on the part of the President that, in a case of claim for extradition falling within the scope of any treaty provision, it was proper for this government, on being requested by the foreign government desiring extradition of an alleged fugitive from its justice, and reasonable cause in the premises being shown, to move to action the proper judicial authorities of the country, in order to the arrest and proper examination of the party charged with crime, and the investigation thereof for the information of the government.

So that, whereas, heretofore, the party desiring the extradition of an alleged fugitive from the justice of a foreign government went, *in the first instance*, to some one of the officers designated in the act of congress of the 12th of August, 1848, entitled "An act for the giving effect to certain treaty stipulations between this and foreign governments for the apprehension and delivery up of certain offenders," and sued out a warrant of arrest, and pursued the other requisitions of that act. Now, in the spirit of the opinions expressed by Mr. Justice NELSON, especially in *Kaine's case*, the party may, if he please, commence by applying to the President of the United States for a mandate ; which being granted, the act of congress above cited then takes up the case and pursues it to the conclusion corresponding to the particular facts, and to our treaty obligations toward the given foreign government.

I say here, in repetition substantially of the idea intimated above, that the foreign government may, *if it please*, apply to

the President for a mandate. The federal government does not require this, but only stands ready to do it if required by the foreign government.

For, when carefully analyzed, the decision in *Kaine's case* appears to be this: Thomas Kaine, charged as a fugitive from the justice of Great Britain, within the treaty, was arrested by one of the commissioners in New York appointed by the Circuit Court of the United States to take affidavits and examinations, and committed to abide the order of the President. Thereupon a writ of habeas corpus in the matter was issued by the Circuit Court of the United States, and, upon a hearing before the district judge, dismissed. After this another writ of habeas corpus was ordered by Mr. Justice NELSON at chambers and a hearing thereon reserved by him to be had before the Supreme Court of the United States in bank. On the argument of the case, eight judges being present, four of them (Justices Catron, McLean, Wayne, and Grier) declared, through Mr. Justice CATRON, that in their opinion the proceedings before the commissioner were correct, and the party had been rightfully committed for extradition, but that the Supreme Court had no jurisdiction of the habeas corpus. Mr. Justice CURTIS, for other reasons assigned by him, came to the same conclusion as to the precise question before the court; and Mr. Justice NELSON, and the Chief Justice, and Mr. Justice DANIEL, for whom he spoke, were of opinion that the proceedings before the commissioner were incorrect, and that the Supreme Court had jurisdiction of the writ of habeas corpus to revise the question of the lawfulness of Kaine's commitment.

Now, it was in the consideration of the question of jurisdiction, the only thing decided by the court, that discussion came up *arguendo*, as to the rightfulness of the proceedings before the commissioner. Mr. Justice NELSON, with whom were the Chief Justice and Mr. Justice DANIEL, expressed the conviction that a previous mandate from the President was necessary, and that no commissioner could lawfully act unless appointed specially *ad hoc;* while the contrary was held by Mr. Justice CATRON, with whom were Justices McLEAN,

In the matter of Nicholas Lucien Metzger.

WAYNE and GRIER; and Mr. Justice CURTIS expressed no opinion upon these points.

The only thing authoritatively adjudged, therefore, by five judges out of eight, was that the Supreme Court had not jurisdiction.

Now, the decision in *Kaine's case*, not definitively establishing the necessity of such a mandate, and that alleged necessity being a part of the argument only, and that of a minority of the court, the minister of the foreign government has the faculty still to go to some lawful magistrate, in the first instance, and take his chance of what may be ultimately adjudged to be the law in the premises. But, if the foreign government desires to be relieved of this hazard, the President has the power, and in the exercise of a just comity, and especially in the discharge of his whole obligation, to see to the faithful observance of treaties, he will, when occasion requires, proceed to give his mandate, by which the foreign government will be relieved of the difficulty arising on the opinion of Mr. Justice NELSON and others of the judges of the Supreme Court of the United States.

In the present case, a warrant of arrest had been issued by the Hon. JOHN W. EDMONDS, of the Supreme Court of the State of New York, who certifies to the President, under date of the 23d instant, that he had had the party before him, and had heard the case upon evidence and argument, and is of opinion that there is not evidence enough of the criminality of the said Calder, according to the laws of the State of New York, to justify his apprehension and committal for trial for the offense charged, if the same had been committed in said State.

Mr. Justice EDMONDS reports the evidence in the case, and supports his conclusion in a carefully drawn opinion; independently of which, the precise question before him was one exclusively within his province as a judge to determine; and upon his report, whether his opinion of the effect of the evidence be erroneous or not, it is clear the President cannot order the surrender of the said Calder.

In the matter of Nicholas Lucien Metzger.

But another question arises upon a second report of Mr. Justice EDMONDS; for it appears that a motion has been submitted to the court to remand the party until new evidence can be obtained from Great Britain to maintain the charge; to grant which application the court has decided not to be within its province, the same resting, if any where, in the government of the United States; upon which, the minister of the British government here applies to the Secretary of State, requesting "that directions may be given for the detention of the prisoner in custody for the time required," for the procurement of "further evidence;" and the inquiry is of the duty and the power of the President in this behalf.

His general duty in this case, of course, is that which the tenth article of the treaty with Great Britain imposes, namely, to "deliver up to justice all persons who, being charged with the crime of murder, or assault with intent to commit murder, or piracy, or arson, or robbery, or forgery, or the utterance of forged paper," committed within the jurisdiction of Great Britain, shall seek an asylum in the United States. (Treaty of August 9th, 1844, 7 Stat. at Large, 576.)

But this, by the terms of the treaty, is to be done upon such evidence of criminality as, according to the laws of the place where the alleged criminal shall be found, would justify his apprehension and commitment for trial, if the crime or offense had been there committed; and the judge and other magistrates thereto lawfully authorized are to cause the arrest of the party charged, hear and consider the evidence, and if on such hearing the evidence be deemed sufficient to sustain the charge, the examining judge or magistrate is to certify the same to the executive.

In like manner the act of congress, which is in execution of, and subordinate to, the treaty stipulations of this class, commits to the judge or magistrate the duty and power of arrest of the party, his examination, the hearing of the evidence, and the determination of the questions upon which, if at all, the surrender of the alleged criminal is to be made; that is to say, in the execution of this treaty, as of other

In the matter of Nicholas Lucien Metzger.

treaties of the same class, the arrest, examination, and decision of fact, are judicial functions and acts. They are not, and they cannot be, performed by the President.

Now, the arrest, examination, and decision being purely judicial acts, it follows, although the act of congress, like the treaty, is silent on that point, yet that the rules of procedure must conform to the law of the land in such matters.

What is to be deemed "sufficient evidence" to sustain the charge is a question for the judge or magistrate to decide according to the laws of the place where the criminal may happen to be examined. So, also, is the question on what day he will sit, what adjournments he will grant, and whether he will remand the party charged for further examination.

All these are things over which the President has no control, and as to which he can give no command. He cannot arrest the alleged criminal; he cannot judge the question of his guilt; he cannot regulate the discretion or conscience of the examining magistrate.

True, the President may, as in this case, issue his mandate for the commencement of the proceedings in the United States; but that mandate is facultative only; it serves, on the hypothesis of the legal conclusion of Mr. Justice NELSON, to give jurisdiction; but that jurisdiction, when thus called into life by the President, rests exclusively with the magistrate making the arrest and examination. If he certifies the criminality of the accused, then the President is to order a surrender; otherwise there is the end, *pro hac vice*, of the duty and power of the President.

Nor can appeal be taken from the decision of Mr. Justice EDMONDS to any other court, so as to revise that decision. The judge or magistrate, in this case, acts by special authority under the act of Congress; no appeal is given from his decision by the act; and he does not exercise any part of what is technically considered the judicial power of the United States. (*Ex parte Metzger*, 5 Howard, 176; *United States* v. *Ferreira*, 13 id. 40, 48, per Chief Justice TANEY; *in re Kaine*, 14 Howard 103, 109, per Mr. Justice CURTIS.)

Indeed, by the municipal law, as well of England as of the United States, the judgment upon the evidence on the preliminary examination of a party accused, as also the mode of conducting the inquiry, including the question of remanding the party, are, in general, matters within the discretion of the magistrate; that discretion being a wise one, of course, and guided by the precedents and doctrines of law, but still not subject to appeal, as such, to another magistrate or court. (1 Chitty's Crim. Law, by Perkins, p. 89; 1 Archbold's Crim. Prac., by Waterman, p. 44; 2 New York Rev. Stat. p. 709.)

I feel constrained, therefore, to come to the conclusion that the President has no power to revise the action of Mr. Justice EDMONDS, or to order the detention of Calder.

However inconvenient this may be to the authorities of the British government, in the present instance, the inconveniences are obviously reciprocal and inevitable. The two governments have, by treaty, agreed to make the question a judicial one; and they could not do otherwise; for the government of the United Kingdom is a constitutional one, as well as that of the United States, and, in both countries, the writ of habeas corpus presents itself as the safeguard, in the hands of the judges, of the individual freedom, against all forcible encroachments on the part of the executive.

I do not perceive how a different conclusion could be reached upon a similar case arising in the United Kingdom. The tenor of the statute there is, that on requisition of the United States, any principal Secretary of State, or certain other executive authorities designated, may issue a warrant to signify that such a requisition has been so made, and to require all magistrates and officers of justice to govern themselves accordingly, and to aid in apprehending the person accused, and committing him to jail, for the purpose of being delivered up to justice; and, thereupon, proceeds the statute, it shall be lawful for the proper magistrate to examine, upon oath, any persons touching the truth of the charge, and upon such evidence as, according to the law of the place, would justify the apprehension and commitment for trial of the person accused of

the crime, had it been committed in that jurisdiction, the magistrate is to commit the accused to jail, there to remain until delivered up, in pursuance of the requisition of the United States. (6 and 7 Vict. ch. 76, § 1.)

There is no indication here of any power on the part of a principal secretary to arrest the alleged fugitive, or to direct the examining magistrate, or to require the detention of the accused for further examination.

All he is empowered by the act to do, is to issue a warrant "to signify that such requisition has been made;" upon which magistrates and oth_ officers of justice are to govern themselves according to the provisions of the treaty and the law of the land.

One thing only, it seems to me, can be done in behalf of the British government. Mr. Crampton may, undoubtedly, cause a new complaint to be entered against Calder, and apply for a new warrant of arrest, either with or without a new mandate from the President. Calder has not been tried. He has been examined by a magistrate, and the evidence adjudged to be insufficient to justify his extradition. But upon a new complaint he may be examined anew by the same or by another mag.'~trate, and the exhibition of additional evidence may . ~ad to the conclusion of his criminality, and the certificate the eof to the President.

Permit ~e, in conclusion, further to suggest, with all proper deference fo. the opinion of Mr. Justice EDMONDS, whether he has not power 'o remand Calder, that is, if, in his judgment, the circumstances of the case and the present stage of the examination justify it. Of the general power of a magistrate to remand for re-examination there can be no doubt, of course, it being the familiar practice of magistrates; and cases are not wanting of prisoners being detained more than twenty days between their first appearance and their commitment for trial, and being brought up for examination several different days during the interval. (1 Chitty's Crim. Law by Perkins, p. 73; 1 Archbold's Crim. Prac. by Waterman, p. 36.)

The authority to do this has been recognized in New York,

In the matter of Nicholas Lucien Metzger.

in the case of a State magistrate examining for a crime charged against the United States. (*Ex parte Smith*, 5 Cow. 273.) In Massachusetts it is regulated and allowed by statute. (Rev. Stat. ch. 135, § 9.) It is true that some adjudications have been made in England which subject the magistrate who remands to an action for alleged unreasonableness of time, even where no improper motive is pretended. What is a reasonable time is a mixed question of law and of fact, depending upon the probability of obtaining further and competent evidence. What is reasonable, Mr. Justice BAYLEY observes on one occasion, does not rest in the discretion of the magistrate; there may be cases in which three days might not be a reasonable time, and yet there may be cases where three months might be reasonable. (*Davis* v. *Capper*, 4 Car. & P. 443, note.)

But the magistrate acts, in the question of remanding, under the peril that, on trespass being brought, a jury, with proper instructions from the court, shall find the time of imprisonment to have been unreasonable (*Davis* v. *Capper*, *ubi supra; S. C.*, 10 Barn. & Cr. 28), which the more conclusively shows that the whole question here is within the jurisdiction of Mr. Justice EDMONDS. And if, having once decided the question of criminality, and made report thereon to the President, this judge should be of opinion that it is too late for him to entertain a motion for delay, and to remand the party until further evidence be procured, it does not seem to me that his doing so can be subject to any just exceptions on the part either of his own government or that of Great Britain. I am, very respectfully,

Your obedient servant,

C. CUSHING.

Hon. WM. L. MARCY, Secretary of State.